799 P.2d 810

The HILL–SHAFER PARTNERSHIP, an Arizona general partnership; Daniel W. Hill and Craig Shafer, Plaintiffs Counter-defendants, Appellants Cross–Appellees,

v.

The CHILSON FAMILY TRUST, dated July 27, 1979 and amended April 22, 1985, Ernest Chilson and Evelyn B. Chilson, Trustees; First American Title Insurance Agency of Coconino, Inc., an Arizona corporation, Defendants Counter-claimants, Appellees Cross–Appellants.

No. CV–89–0342–PR.

Supreme Court of Arizona,
En Banc.

Sept. 18, 1990.

Reconsideration Denied Nov. 6, 1990.

Lewis and Roca by John P. Frank and Dioguardi, Poli & Ball, Ltd. by Michael N. Poli, Phoenix, for The Hill–Shafer Partnership, Daniel W. Hill and Craig Shafer.

Fennemore Craig, P.C. by James Powers, Nancy L. Rowen and Loral L. Deatherage, Phoenix, for The Chilson Family Trust, Ernest Chilson and Evelyn B. Chilson.

**1.** The buyer was a partnership, whose representatives will sometimes be referred to as "buyer" in this opinion. The seller was a family trust whose representatives will sometimes be re-

## OPINION

MOELLER, Justice.

### JURISDICTION

A buyer[1] sued for specific performance of a contract for the sale of land. The seller counterclaimed, seeking rescission of the contract. The trial court held there was a lack of mutual assent and granted summary judgment to the seller. The court of appeals reversed, holding that the facts did not present an issue of lack of mutual assent, but remanded for further proceedings on a theory of unilateral mistake. We granted seller's petition for review and have jurisdiction pursuant to A.R.S. § 12–120.24 and Ariz. Const. art. 6, § 5(3).

### ISSUES

1. Whether, under the facts of this case, rescission of a real estate purchase contract on grounds of lack of mutual assent is precluded because the misunderstanding relates to a legal description of land.

2. Whether the trial court, on the particular facts before it, correctly granted summary judgment rescinding the real estate purchase contract on the grounds of lack of mutual assent.

### FACTS

Ernest Chilson and Evelyn Chilson, trustees of the Chilson Family Trust, own approximately twenty acres of land south of Flagstaff on Butler Avenue. The tract, although contiguous, can be divided into three distinct units, as shown in the diagram below. The large parcel, containing about 17.3 acres, is bisected by Butler Avenue into "Butler North" and "Butler South." The smaller parcel, called the "Triangle," is a 2.4 acre triangular piece of land north of the larger parcel.

ferred to as "seller" in this opinion.

Triangle        -- 2.4 acres

       -- 13.0 acres

Butler North        -- Butler Avenue

       -- 4.3 acres

Butler South

The Chilsons originally acquired the property in two separate transactions. Later, they directed a title agency to prepare one deed to include the property north of Butler and another deed to include the property south of Butler. The Chilsons used these two deeds to convey the property to themselves as trustees of a family trust.

In December 1984, the Chilsons listed the Triangle and Butler North with a broker, seeking a tenant for a long-term lease. Daniel Hill and Craig Shafer, general partners in the Hill–Shafer Partnership (buyer), saw a sign posted on the north side of Butler Avenue and became interested. Buyer contacted seller's broker and obtained a copy of the appraisal which listed the property as "15 acres of vacant land on the north side of Butler Avenue, one-quarter mile west of the Butler Interstate 40 interchange." The appraisal valued the property at $620,500.

Buyer inspected the land, and submitted a letter of intent proposing terms to purchase the listed property for the appraised value of $620,500. Buyer's letter of intent described the Triangle and Butler North plots of land, as had the listing and the appraisal. Buyer proposed that the final price of $620,500 be subject to an adjust-ment, depending on the actual acreage to be determined by a survey. The offer also contained certain proposed representations and warranties by seller as to location and size.

Seller rejected the proposal and, instead, directed its attorney to prepare a "take it or leave it" counter-offer at the same purchase price. Seller refused throughout negotiations to include a map as a part of the contract, and also refused to indicate the size of the parcel of land or to describe its location in lay terms or by reference to nearby landmarks. Seller also refused to agree to a price-per-acre adjustment mechanism or to make price in any way contingent upon an acreage figure to be determined by survey. Instead, seller insisted that the price be fixed at $620,500, and that the land be identified by legal description alone. Seller also proposed to make close of escrow contingent upon buyer's satisfaction with an economic and feasibility study that buyer would perform at its expense after receipt of a survey from seller.

The legal description contained in seller's counter-offer did not, in fact, describe the Triangle and Butler North. Rather, it described Butler North and Butler South. Buyer "accepted" seller's counter-offer and the parties entered into a contract.

Escrow instructions were signed on July 5, 1985. When seller reviewed the escrow instructions in mid-July, he discovered the error in the legal description. Seller has consistently contended it always intended to sell Butler North and the Triangle, and that the use of the legal description which instead described Butler North and Butler South was due to an error. Seller contends the error originated in one of the two earlier deeds prepared by the title company by which the Chilsons transferred the property to the trust. Seller borrowed the description from one of the earlier deeds on the mistaken assumption that it described the Triangle and Butler North.

Upon discovery of the error, seller prepared an amendment to correct the legal description. Buyer refused to accept the amendment and contended it was entitled to a conveyance of the property included in the legal description. As a result of the dispute, seller cancelled the escrow, and buyer sued for specific performance. Seller counterclaimed, alleging fraudulent concealment and racketeering, and also sought rescission and a decree quieting title in it. The trial court granted summary judgment against seller on the fraud and racketeering claims, which are not involved in this appeal. The trial court also granted summary judgment against buyer on the specific performance claim and for seller on the quiet title claim, rescinding the contract for lack of mutual assent.

Buyer appealed from the summary judgment, and seller cross-appealed from what it considered to be an inadequate award of attorney's fees. The court of appeals reversed the summary judgment, holding that because the legal description in the contract was not ambiguous or vague, no misunderstanding concerning it could be the basis for relief on a theory of lack of mutual assent. The court of appeals remanded for further proceedings on a theory of unilateral mistake. *The Hill–Shafer Partnership v. The Chilson Family Trust*, 162 Ariz. 485, 492–93, 784 P.2d 691, 698–99 (App.1989). We granted seller's petition for review. We conclude the trial court properly granted summary judgment on a theory of lack of mutual assent.

## DISCUSSION

In reviewing summary judgment, we view the evidence in a light most favorable to the party opposing it. Such party must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Wisener v. State*, 123 Ariz. 148, 149, 598 P.2d 511, 512 (1979). Summary judgment is appropriate when there is no substantial evidence to support an alleged factual dispute, either because the tendered evidence is too incredible to be accepted by reasonable minds, or because, even conceding its truth, it leads to an inevitable legal conclusion against its proponent. *Compton v. National Metals Co.*, 10 Ariz.App. 366, 371, 459 P.2d 93, 98 (1969); *see also Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir.1985). The inquiry in summary judgment cases, as in directed verdict cases, is whether reasonable jurors applying the law to the facts could reach but one conclusion. *See Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 486, 724 P.2d 562, 572 (1986); *City of Phoenix v. Great Western Bank*, 148 Ariz. 53, 61, 712 P.2d 966, 974 (App.1985).

In the case before us, assuming all inferences in favor of buyer, we are convinced, as was the trial judge, that reasonable minds could only conclude that there was no mutual assent by the parties. All parties agree that initially all negotiations were directed towards Butler North and the Triangle. Both the appraisal and the letter of intent described and set a price only for the property north of Butler. Buyer's essential contention is that once seller made a counter-offer, the entire posture of the deal changed. Buyer argues that, although it offered to buy only the property north of Butler, once the seller insisted the property be identified by legal description alone, buyer's intent shifted (although uncommunicated to seller) and it thereafter intended to purchase whatever was contained in the legal description, regardless of what it was or where it was.

To fully explain why summary judgment was appropriate under the highly particu-

larized facts of this case, a full understanding of the respective factual positions of each party is necessary. To that end, it is helpful to examine in detail the deposition testimony that was submitted to the trial court. Accordingly, we set it forth at length in the Appendix to this opinion.

A careful examination of the deposition testimony demonstrates that no testimony or reasonable inference rebuts seller's testimony that seller only intended to convey the property north of Butler. Absent any such testimony or inference, buyer relies solely on the fact that seller insisted that a legal description govern. Our review of the evidence leads us to hold that, under these particular facts, the only reasonable conclusion to be drawn from the evidence is that seller insisted on use of a legal description to avoid a price adjustment based on the actual acreage of the property north of Butler. There is no evidence that the parties ever discussed any property south of Butler. The first and only time Butler South crept into the deal was in the legal description contained in seller's counter-offer. Buyer's agents testified that, although they knew they were purchasing property in the Butler area, they had no specific knowledge of how many acres were involved. Buyer was not even sure seller owned the parcel south of Butler. Seller, on the other hand, was interested only in selling Butler North and the Triangle.

■ Generally, if a seller intends to sell and a buyer intends to buy land other than that described in a deed, a case of mutual *mistake* is presented. *United Bank of Arizona v. Ashland Development Corp.*, 164 Ariz. 312, 315, 792 P.2d 775, 778 (App.1990); *Underdown v. Reche*, 122 Ariz. 439, 440, 595 P.2d 671, 672 (App.1979); *Chantler v. Wood*, 6 Ariz.App. 134, 138, 430 P.2d 713, 717 (1967). A mutual *mistake* exists where there has been a meeting of the minds of the parties, and an agreement is actually entered into, but the agreement in its written form does not express what was really intended by the parties. *Newton v. Brown*, 222 Neb. 605, 613–14, 386 N.W.2d 424, 430 (1986); *Akker-

man v. Gersema*, 260 Iowa 432, 437–38, 149 N.W.2d 856, 859 (1967). Justice Holmes wrote:

When both parties to a conveyance have intended to describe a certain parcel of land identified by their senses, and by the words of their previous agreement, and have used words supposed by them to be apt for their purpose, but in fact describing that parcel, and something more, the full purport of all their acts, taken together, is only to convey the parcel intended....

*Goode v. Riley*, 153 Mass. 585, 586, 28 N.E. 228, 228 (1891).

Because we view the evidence in the light most favorable to buyer, we accept its contention that it intended to purchase whatever the legal description identified, regardless of size or location. Because seller did not have a similar intent and did not intend to convey whatever was included within the legal description, this case does not present a problem of mutual *mistake* but, rather, a problem of lack of mutual *assent*.

■ It is well-established that before a binding contract is formed, the parties must mutually consent to all material terms. A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent. *Gifford v. Makaus*, 112 Ariz. 232, 236, 540 P.2d 704, 708 (1975); *Heywood v. Ziol*, 91 Ariz. 309, 314, 372 P.2d 200, 203 (1962). If one party thinks he is buying one thing and the other party thinks he is selling another thing, no meeting of the minds occurs, and no contract is formed. *Fleischer v. McGehee*, 111 Ark. 626, 163 S.W. 169, 171 (1914); *see McCarty v. Anderson*, 58 So.2d 255, 259 (La.App. 1952) (contracts are founded on the agreements, not on the disagreements, of the parties. Where they misunderstand each other, there is no contract).

■ The most famous statement of this point of law arose in the case of *Raffles v. Wichelhaus*, 2 Hurl. 906, 159 Eng.Rep. 375 (1864). In *Raffles*, the parties agreed on a sale of goods which was to be delivered from Bombay by the ship "Peerless." In

fact, two ships named "Peerless" were sailing from Bombay at different times, and each party had a different ship in mind. The arrival time of the merchandise was of the essence to the contract. Because the understandings of the parties were different as to a material term, no binding contract was formed.

Importantly, however, mutual assent is based on objective evidence, not on the hidden intent of the parties. *Lerner v. Brettschneider,* 123 Ariz. 152, 155, 598 P.2d 515, 518 (App.1979). In other words, what is operative is the objective manifestations of assent by the parties. *Sheriff's Employees Ass'n v. Merced County,* 188 Cal.App.3d 662, 670–71, 233 Cal.Rptr. 519, 524 (App.1987). As the *Restatement* describes it, a contract is formed if there is "manifestation of mutual assent to the exchange and a consideration." *Restatement (Second) of Contracts* § 17 (1979). Additionally, the Restatement explains the effect of misunderstandings on contracts:

**20. Effect of Misunderstanding**

(1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and

(a) neither party knows or has reason to know the meaning attached by the other; or

(b) each party knows or each party has reason to know the meaning attached by the other.

(2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

(a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or

(b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

*Restatement (Second) of Contracts* § 20 (1979).

, The first subsection describes the circumstances under which the parties' misunderstanding of the meaning of their manifestations prevents formation of an enforceable bargain. The second subsection describes the circumstances under which a bargain may be enforceable in accordance with the meaning that one party has attached. Under Section 20(1), "Even though the parties manifest mutual assent to the same words of agreement, there may be no contract because of material difference of understanding as to the terms of the exchange." *Restatement (Second) of Contracts* § 20 comment c, *see also* comment d. Insofar as the land in this litigation is concerned, we believe the case is governed by Section 20(1)(a) and, therefore, do not reach the alternative provisions of Section 20.

The court of appeals held that no lack of mutual assent can be found due to a misunderstanding where no ambiguity or vagueness exists in the words of a contract. The court of appeals relied on the reporter's note to Section 20, which states:

A contract should be held nonexistent under this section only when the misunderstanding goes to conflicting and irreconcilable meanings of a material term that could have either but not both meanings.

■ Relief is proper if the writing evidencing the purported agreement is uncertain or ambiguous. *Volpe v. Schlobohm,* 614 S.W.2d 615, 618 (Tex.App.1981); *Strong v. Lane,* 66 Minn. 94, 97–98, 68 N.W. 765, 766 (1896); 1 S. Williston, *Contracts* § 95 (3d ed. 1957). The legal description contained in the contract, the court of appeals reasoned, contained no ambiguity or ambivalence. In fact, a legal description is the most precise description that can be devised. Therefore, the court of appeals held that the seller cannot claim a misunderstanding occurred or that no meeting of the minds existed as to an essential term. Although the court of appeals' logic has a certain force to it, we cannot agree with it.

■ A dual meaning is only one situation in which a court can find a lack of mutual assent. As stated by the court in *Buckmaster v. Dent,* some extrinsic facts could create "a latent ambiguity in otherwise clear and intelligible language." 146

Ariz. 521, 523, 707 P.2d 319, 321 (App. 1985). *See Hamada v. Valley National Bank,* 27 Ariz.App. 433, 435, 555 P.2d 1121, 1123 (1976). For example, in *Heywood v. Ziol,* 91 Ariz. 309, 372 P.2d 200 (1962), the parties agreed on a contract with an option to renew the lease. The parties crossed out a provision that provided that rent during the renewal period would be $150 a month, the same as that specified for the initial term. Both parties initialed the deletion. The landlord later demanded a rental of $250 upon renewal. The tenant insisted that it was understood that the rental price would remain at $150 a month notwithstanding the deletion. The landlord argued that the tenant had misunderstood. We held that because the parties did not understand alike, their minds did not meet and there was no contract. *Id.* at 314, 372 P.2d at 203.

In *Buckmaster,* buyer and seller signed a contract for the purchase of property. The purchase contract reserved an "easement" to the sellers. The sellers claimed that the word "easement" did not refer to a single easement but actually referred to two easements. Despite the rather clear language of the contract, the court of appeals looked to the extrinsic facts surrounding the contract and the conduct of the parties and held the parties reasonably had different understandings. Consequently, no contract was formed and summary judgment rescinding the contract was appropriate. *Buckmaster,* 146 Ariz. at 523, 707 P.2d at 321.

As long as the misunderstandings of the parties are reasonable under the specific circumstances of the case, a court may properly find a lack of mutual assent. We do not believe that the fact that a legal description is the source of the misunderstanding precludes relief.

The legal description in this case reads as follows:

The following described real property situated in Coconino County, Arizona:

The East half of the Northeast quarter of the Northeast quarter of Section 23, Township 21 North, Range 7 East;

EXCEPT the Southwest quarter of the Southeast quarter of the Northeast quarter of the Northeast quarter; and

EXCEPT a strip of land 88.00 feet in width, the centerline of which is described as follows:

BEGINNING at a point from which the Northeast corner of Section 23, Township 21 North, Range 7 East, Gila and Salt River Base and Meridian is North 0 degrees 44 minutes 59 seconds west a distance of 753.26 feet; Thence South 70 degrees 09 minutes 11 seconds West a distance of 32.67 feet to the point of curvature of the curve to the left having a radius of 600.000 feet and a central angle of 12 degrees 48 minutes 25 seconds; Thence along a side curve a distance of 134.11 feet to a point of tangency; Thence South 57 degrees 20 minutes 46 seconds West a distance of 340.23 feet to the North line of the Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 23.

The seller believed the description covered only the property north of Butler. It did not. To an untrained person, the language of a legal description is susceptible of different interpretations. In fact, the parties in this case testified they could not understand the technical terminology of the legal description. Shafer, the buyer, testified the description looked "like Greek" to him. Chilson, the seller, testified that: "I just had to assume that it was correct of what we intended to do, and found out later it wasn't, however." Deposition of Chilson, Jan. 17, 1986, at p. 20. As stated earlier, the price of $620,500 was determined after an appraisal of the Triangle and Butler North. Buyer submitted a letter of intent only on the property north of Butler. The property south of Butler was never discussed. Seller believed the description contained in the offer described the property that had been listed and discussed. Had buyer accepted the offer on that basis and with the same intent, a binding contract (subject to reformation) might well have been formed for the sale of the land north of Butler. However, buyer's intent varied from seller's. Buyer's understanding was that it would acquire whatev-

476

er was included in the legal description, regardless of size or location. We disagree with the court of appeals' conclusion that the preciseness of a legal description, as a matter of law, prevented a rescission based on a misunderstanding. Any reasonable view of the evidence inevitably leads to the conclusion that there was no meeting of the minds and no enforceable contract was formed. We conclude that the trial court properly granted summary judgment in favor of the seller.

## DISPOSITION

The evidence supports the trial court's conclusion that, as a matter of law, there was no mutual assent. Therefore, the trial court's grant of summary judgment in favor of the seller is affirmed. The court of appeals' decision is vacated.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON, J., concur.

CORCORAN, J., recused himself and did not participate in the determination of this matter.

## APPENDIX

### EXCERPT OF DEPOSITION TESTIMONY OF CRAIG SHAFER (BUYER)

October 21, 1985, pp. 23–32

Q. [By Seller's Attorney] When Mr. Nordlinger brought you the counter offer, was it your understanding that you were still negotiating to buy this same property that you had talked about in your letter of intent?

A. Well, the counter offer was very difficult for a lay person to read. It wasn't broken down like ours was, and I muddled my way through it.

And it appeared at that time that our letter of intent had been discarded and that we had started over from square one in negotiating a new deal.

Q. Mr. Shafer, as a lay person, at that point in time, did you still think that you were talking about a transaction concerning this same property—

A. Well—

Q. —that you had been talking about all along?

A. I didn't know what we were talking about. The entire posture of the deal had changed. The counter that they came back with did not describe the property in any way, shape or form, except for the legal description. I was very concerned about the way it was drafted.

I was concerned about the major deal points which had been changed, some of which being they took a 30–year deal and interest payments only, made it into a 10–year deal. They doubled the down payment from 52,000 to a hundred and fourteen thousand. They made that payable in—or the earnest money was payable in cash instead of a letter of credit.

They took all of the layman's language out about describing the property. They were not willing to warranty the property. We asked for, I believe, nine sellers' warranties in regard to the property. They had nothing in there about any of that. And I was concerned about the easement for Butler Avenue and other easements which I had heard about and discussed with the appraisers, and I wanted to see something in there about that.

The penalties in the note were, the best I could tell, were close to extortion. There was no adjustment in the purchase price to reflect actual acreage or net acreage. There was no feasibility study in their original counter. It cost us $10,000, $60 a day, for the feasibility period.

\* \* \*

Q. One of the things that you mentioned was that the first counter offer that you received contained no provision in it for an adjustment to compensate for changes in acreage. Was that something that had been contained in the letter of intent?

A. Yes. It's item no. 21 in the letter of intent.

Q. Okay, thank you.

A. Paragraph 21.

Q. Mr. Shafer, you knew when you received the counter offer that it contained the same purchase price as had been contained in the letter of intent; right?

A. Well, as far as I could see, that was the only thing that remained the same, was the purchase price.

Q. Did that indicate to you that you were buying the same property as you had been talking about in the letter of intent?

A. Well, the way the thing was drafted, with no reps—representations—and no warranties, no adjustment of price, no maps, nothing, except the legal description, I knew full well that the legal description was the property that was provided for in the contract and that was the property that was to be purchased.

I didn't know at that time what the legal description said. I'm not—I can't look at a legal description and tell you what it is. It looks like Greek to me. I would have to hire somebody to have them plot the legal description on a map.

Q. Mr. Shafer, I understand that from looking at the legal description contained in that contract, which was the only description of the property contained in the counter offer, that as a lay person you believe you would not have been able to determine exactly what and where that property was.

What I'm asking you is: As a lay person, did you believe at that time in your own mind that this was a transaction for the same property that you had been talking about in the letter of intent?

\* \* \*

A. At that time, I knew that the deal was changing, and that it was—I was curious as to why the seller would not represent the property in any way, shape or form. And I did not know at that time what property was being described in the counter offer. And I was curious as to why they had chosen to not represent the property in layman's terms so that someone like me could determine, but they chose not to, and I did not know what property was described.

\* \* \*

Q. Am I correct, Mr. Shafer, that you eventually did agree to sign a contract for property in which you did not know how much property there was or where it was located?

A. We knew full well that when we signed the executed document, that we were buying the property that was described in the legal description, and that we would be provided with the proper survey to determine what that property was.

Q. Mr. Shafer, at the time that you signed the contract, am I correct that you did not know where that property was or how much property was involved?

A. We assumed that when we signed the contract we had—we were purchasing property from—obviously purchasing property from Mr. Chilson in the Butler Avenue area.

We did not know at that time how much property there was or what the actual location of the property was, even though we had asked that they describe the property to us and we had asked for maps and we had asked for representations of the seller. For reasons unknown to us, the seller chose not to disclose any of this information, and the only thing that we were given was the legal description.

And I remember I was very, very concerned about this, and I called Dan and I said, "Dan, they're not going to represent the property in any way, shape or form except for the legal description."

And Dan told me at that time that it's been his experience if, in fact, we have negotiated a feasibility period where we're going to get a proper survey done, and when that work is completed, that we can have a chance to look and see what the property is and where it's located.

EXCERPT OF DEPOSITION
TESTIMONY OF DANIEL
HILL (BUYER)

October 21, 1985, pp. 26–28

Q. [By Seller's Attorney] When Mr. Shafer had the discussions with you about the contract that had been presented by Mr. Chilson's attorneys, was it your under-

standing that you were now involved in negotiations to buy different property than that property identified in the May 23rd letter of intent?

A. We had no knowledge of what property we were buying. We requested those representations and they weren't prepared to give them to us. All we knew was that we were buying whatever was in that legal description in that contract, but we did not know exactly what that property was.

Q. Mr. Hill, on May 23, 1985, when you submitted a letter of intent, you identified certain property north of Butler in that letter of intent. Did you feel in the ensuing time period when you had discussions with Mr. Shafer that you were now negotiating to buy property somewhere else?

A. I did not feel anything. All I knew was a contract had been presented to us on the take-it-or-leave-it basis, and we didn't know and were not going to find out exactly what land we were buying until we got a proper survey done.

Q. Am I correct then that when you had these discussions with Mr. Shafer, you didn't have any idea where the property was that you were thinking of buying?

* * *

A. Again, all we—we knew we were purchasing whatever the legal was, but we were not—we didn't know exactly where that property was, and Mr. Chilson was obviously not prepared to let us know where it was, to represent where it was or how much it was.

* * *

Q. When you were having those discussions, what property did you think you were talking about? Did you have any idea where that property was?

A. I assumed the property was somewhere in the general area of the property we'd offered on.

Q. Isn't it true that you really thought that you were talking about a contract on the same property you had made your offer on?

[Objection made.]

A. We did not know what property we were buying. When they laid the take-it-or-leave-it contract on us, we didn't know exactly what we were getting.

My experience has been that when somebody does that, you really don't know and you don't find out exactly what you're buying until you get down and get the proper survey, an up-to-date survey, done.

Q. During the time you were having these conversations with Mr. Shafer, were you aware that Mr. Chilson also owned the property south of Butler?

A. I wasn't aware of any of what Mr. Chilson owned south or north, one way or the other, for sure.

EXCERPT OF DEPOSITION
TESTIMONY OF ERNEST
CHILSON (SELLER)

January 17, 1986, pp. 117–125

Q. [By Buyer's Attorney] All right.

Now there's no layman's description such as that in the purchase contract, is there?

A. No, no.

Q. Do you know whether or not the Hill–Shafer group wanted such a layman's description in the purchase contract?

A. I have no idea.

Q. Why was the—to your knowledge, why was the layman's description that was in the Letter of Intent deleted from the Purchase Contract?

A. I don't think this is fitting to put in a Purchase Contract, this right here (indicating).

Q. Why not?

A. It doesn't give a legal description that you can follow. It's just by names. It doesn't mean anything.

Q. So in other words, as far as you're concerned, the only accurate way to describe a piece of property is through the legal description?

A. I believe so.

Q. And as far as you're concerned, the legal description should govern?

A. In the end, yes.

\* \* \*

Q. Now also as part of this Letter of Intent, and take a minute to look through it if you need to, there is a provision in there that we'll call an adjustment provision whereby the price goes up and down depending upon the actual acreage that is measured by the survey, is that right?

A. Well, I believe there was.

\* \* \*

Q. All right....

Now does that adjustment provision, as you read it now and more importantly as you understood it at the time you received the Letter of Intent, does that adjustment provision provide that the purchase price for the property will vary up or down depending upon the actual amount of acreage as measured by a survey?

A. Net acreage, yes.

\* \* \*

Q. All right.

Now there's no provision similar to that in the Purchase Contract, Exhibit 2, is there?

A. No, there isn't.

Q. Do you know whether or not the Hill–Shafer group wanted such an adjustment provision?

A. No, I don't know why they might have wanted it, no.

Q. Do you know whether, in fact, they did want it?

A. No, except they had it in the Letter of Intent.

Q. And they also—so by that you assume that they wanted it, right?

A. They did at that point.

Q. All right, and they also have this layman's description back here on Page One of the Letter of Intent?

A. Uh-huh.

Q. So I take it you would also assume that at least at one time they wanted that in the contract also, right?

A. Yes.

Q. Did you ever discuss with your attorney why that adjustment provision, as we are calling it, was not included within the Purchase Contract, or whether it should be included?

A. I think he was operating under my instructions.

Q. What were they?

A. That as a result of the old survey, which included this map (indicating) and the Assessor's acreage and my computations of acreage in there, that the only change being that Butler had made a slight change in there and should be, would be some little adjustment in the acreage, that the 15 acres was safe for anybody.

Q. So in other words, as far as you were concerned, the adjustment provision wasn't necessary because you were sure of how much acreage was there?

A. Yes, either that or more, I felt.

Q. All right, and so in other words, by putting the adjustment provision in if there was only acreage it only would have protected you, correct?

A. That's not my purpose. My purpose was that if you leave that open, every little easement that comes up and whatnot or that becomes any problem, they want to adjust back and forth, and it's just an ongoing problem that never quits, and if you can firm it up at the start, that this is the price for the property, it's so much simpler to handle legally and for me especially.

Q. Regardless of how much acreage the property turns out to actually be?

A. Well, no, sure, if there is only half that much there, why I would know it, and I don't think that's a question at all in this case.

Q. But if—

A. I was satisfied there's right at 15 acres, and it turned out to be more, so ...

It was a break for Mr. Hill and Shafer.

Q. It turned out to be more because of the inclusion of the south parcel, right?

A. No, without the south parcel, 15.39 acres, and I said there was 15.

\* \* \*

Q. Now the Purchase Contract does not contain any warranties or representations as to the location or size of the property to be purchased, does it?

A. No, I don't believe it does.

Q. Do you know whether or not the Hill–Shafer group wanted such warranties or representation as to location or size?

A. Steve Nordlinger mentioned to me that they did want those warranties in there.

Q. Did you ever discuss with Mr. Nordlinger whether or not you were willing to give such warranties?

A. No. I think I said to him that I'd rather not have it in the contract. It's a cleaner contract if we can leave it out.

\* \* \*

Q. When you say that it's a cleaner contract without the warranties and representations, what do you mean?

A. It saves time and don't have to renegotiate and back and forth and spend laywer's time and money to do it. It's quicker and easier if you can eliminate all of those unforeseeable things at the outset.

Q. The purpose of warranties or representations just would have been to make sure that everyone knew exactly what was being purchased, right?

A. Mostly, I guess.

Q. So it's—far from resulting in a greater expenditure of time, if anything, it might have saved time and misunderstandings, might it not?

A. That's your opinion, not mine.