810 P.2d 612

**EVERGREEN WEST, INC., a Delaware corporation, Plaintiff/Appellant,**

v.

**Mike BOYD, Pima County Recorder, Defendant,**

and

**Equivest Properties, a Texas general partnership, Real Party-in-Interest, Defendant/Appellee.**

No. 2 CA–CV 90–0251.

Court of Appeals of Arizona, Division 2, Department B.

Jan. 31, 1991.

Appeal Dismissed April 11, 1991.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Jenne S. Forbes, Tucson, for plaintiff/appellant.

Slutes, Sakrison, Even, Grant & Pelander, P.C. by Tom Slutes, Tucson, for real party-in-interest, defendant/appellee.

## OPINION

HOWARD, Judge.

This appeal is taken from the judgment of the trial court on the complaint of appellant Evergreen West, Inc. ("Evergreen") denying Evergreen's request for the removal of a lis pendens pertaining to certain real property in which Evergreen claims an interest. We have jurisdiction pursuant to A.R.S. § 12–2101(B). We affirm.

## FACTS

The property in question is a 35–acre parcel designated by the parties as the "Valencia Property." It is a small portion of a 1,300–acre property now known as "Midvale Park." The entire Midvale Park property was originally owned by Estes Homes, a general partnership ("Estes"). In 1981, Estes and an affiliated water company entered into an agreement with the City of Tucson which provided among other things for the annexation of Midvale Park by the city and the adoption of zoning ordinances and development standards governing the development of Midvale Park. The annexation agreement is expressly made binding upon the parties' "respective heirs, beneficiaries, personal representatives, successors, successor in interest [sic] and assigns."

In 1985 the parties to the annexation agreement agreed upon, and the city adopted, comprehensive development standards for the property. Section 1 of the development standards states:

> *PURPOSE.* The purpose of this Agreement is to establish the procedures and development standards which shall govern the City review of public and private improvements to be constructed by the Developer on Midvale Park following annexation of Midvale Park to the City. The intent of the parties is to place the Developer *or its designated assigns* (hereinafter the "Developer"), following annexation to the City, in substantially the same position he occupied with respect to procedures and development standards which would be applied by Pima County were Midvale Park not to be annexed.

(Emphasis supplied.) The development standards contain the city's approval of Estes's master plan for Midvale Park and, specifically, for the construction of Oaktree Drive and Headley Road, two major streets within the development. Section 6 of the standards provides that the cost of all on-site improvements, including streets, "will be the responsibility of the Developer" but does not specify when any of the improvements must be built. The city reserved "the right to refuse to accept dedication" of any improvement not constructed in accordance with the standards but, once accepted, assumed the maintenance costs of the roads.

In December 1988, Estes and appellee Equivest Properties, a general partnership ("Equivest"), entered into two interdependent option agreements covering two separate but adjacent parcels in Midvale Park.

The first agreement pertained to the Valencia property, a 35–acre parcel located on the northwest corner of the intersection of Valencia Road, an existing road forming the southern boundary of the parcel, and Midvale Park Road, an existing road forming the eastern boundary. The second agreement pertained to what was designated the Midvale/Headley parcels, three adjacent parcels totalling approximately 29 acres located immediately north of the Valencia property. The Midvale/Headley parcels were bounded on the east by Midvale Park Road and on the north by a portion of the proposed Headley Road. Both properties were bounded on the west by a portion of the proposed Oaktree Drive. Between the western boundary of the properties and proposed Oaktree Drive is a completed drainage ditch approximately 20 feet wide.

Several provisions of the agreements are critical to this litigation. Paragraph 7.02 of both option agreements provided that, upon exercise of the options, title was to be conveyed to Equivest subject to, among other things,

C. All matters pertaining to the development of the Property on file with Pima County Arizona, or the City of Tucson, Arizona, or any agency or department thereof on the date of this Agreement, including, but not limited to, the provisions of [the annexation agreement], the provisions of such Agreement being incorporated herein by reference;

D. Statutes, ordinances and governmental regulations governing the use, occupancy and development of the Property.

Article VI of both option agreements acknowledged that development of the properties would require construction of those portions of Oaktree Drive and Headley Road adjacent to the properties. The agreements provided that such construction could be funded through the creation, at either party's initiative, of an improvement district or directly by either party. In either event, the cost of construction was allocated between the parties with a specified cap on the amount Equivest was required to contribute and Estes to pay the balance. Either party could "trigger" construction of the roads.

At the time the agreements were entered into, Chase Manhattan Bank ("Chase") held a lien on the properties and, because Estes was in default on its loan from Chase, the agreement required Chase's approval as a condition subsequent. Paragraph 13.02 in both agreements provided:

13.02 *Chase Approval.* Purchaser acknowledges having been advised by Seller that Chase ... holds a lien on the Property, and Seller must negotiate certain agreements with Chase which allow Seller to perform its obligations under this Agreement in a manner consistent with Seller's business needs and objectives. Accordingly, Seller's obligations under this Agreement shall be subject to the specific condition subsequent that this Agreement shall be approved in writing by Chase in a manner which allows Seller to perform its obligations under this Agreement in a manner acceptable to Seller, in Seller's sole discretion. Seller shall use its best efforts to obtain the written consent of Chase on or before the thirtieth (30th) day after the Commencement Date. The condition subsequent established by this Paragraph 13.-02 may only be waived by Seller, in Seller's sole discretion. Seller shall advise Purchaser ... whether the condition subsequent established by this Paragraph 13.02 has been satisfied or waived by Seller. If Seller fails to obtain the written consent of Chase in a manner acceptable to Seller, in Seller's sole discretion, on or before the thirtieth (30th) day after the Commencement Date, then this agreement shall not be rescinded, but the Option Period shall be extended as provided in Paragraph 7.05 of this Agreement. Notwithstanding the foregoing, Seller shall have the right, in Seller's sole discretion, to rescind this Agreement if Seller determines that Chase will not consent to the transaction contemplated by this Agreement in a manner acceptable to Seller; in that event, Seller shall give notice of recision [sic] to Purchaser as required by Paragraph 14.07 of this Agreement. In addition, this Agreement

shall be deemed rescinded if the written approval of Chase, in a manner acceptable to Seller, is not obtained on or before the ninetieth (90th) day after the Commencement Date. In the event of such recision [sic], Seller shall return the $100.00 Option Consideration to Purchaser and Escrow Agent shall be authorized to cancel escrow without further instruction from either Seller or Purchaser.[1]

Estes submitted the agreements to Chase, which responded by letter dated April 18, 1989, approving the transaction subject to certain enumerated conditions. Of importance to this litigation are paragraphs seven and eight of the letter. Paragraph seven required that Equivest enter into an agreement with Chase recognizing the latter as the seller and owner of the property under the option agreements in the event Chase acquired the property by foreclosure or by deed in lieu of foreclosure. Paragraph eight provided that the agreement with Equivest would recognize Equivest's rights under the option agreements provided that Chase was expressly relieved from "the obligation to incur any costs or expenses (other than title insurance premiums, escrow fees and recording fees) in connection with the Option Agreements." The paragraph went on to specify that Chase would not be responsible for the costs of, among other things, forming improvement districts or construction of Oaktree Drive and Headley Road.

The Chase letter was forwarded to Equivest, which responded by letter dated May 9, 1989. The letter identified two conditions in Chase's letter which had "a materially adverse affect [sic] upon Equivest." The only one material to this litigation was Chase's requirement that, should it "stand in the shoes of Estes," it not be responsible for the seller's portion of the costs. The letter concludes: "If you could reach an accomm[od]ation with Chase in reference to our concerns on the above matters, Equivest, as the purchaser of the properties, would agree to comply with the other requirements of Chase's letter."

Two months later, Estes advised Equivest by letter dated July 17, 1989, that it had been negotiating with Chase to gain its approval of the transaction.

We are writing to inform you that Estes has not obtained concessions from Chase that would allow formation of improvement districts for the purpose of constructing Headley Road and Oaktree Drive as described in Paragraph 6.02 of the Agreements. Consequently, in accordance with Paragraph 13.02 of the Agreements, since Estes believes that "Chase will not consent ... in a manner acceptable to Seller," Estes is prepared to rescind the Agreements and authorize the escrow agent to cancel escrow as of July 31, 1989. If this should occur, your two option consideration payments of $100.00 will be promptly returned.

Notwithstanding the above, it occurs to us that Equivest may be prepared to resolve this situation by:

1) Agreeing to delete from the Agreements all provisions regarding the construction of Headley Road and Oaktree Drive and stipulating that Estes shall have no responsibility for any costs associated with said construction whether incurred directly or through an improvement district. This would allow closing to proceed on the Valencia Parcel and the purchase option payment to be made on the Midvale/Headley Parcels, or

2) Dealing with this offsite issue as stipulated in (1) above, but closing only on the Valencia Parcel (in this case the agreements would have to be "severed"), and/or

3) Agreeing to purchase all of Parcel FF at Midvale Park for $2.50 per square foot on a cash basis. (This parcel has no "offsite" improvement issues to be addressed.)

We appreciate the fact that this "Chase" issue has taken quite some time to finally address, and hope that the resolutions contained in (1–3) above may be acceptable to Equivest.

If we can come to a meeting of the minds on how to resolve this proposed

---

1. No issue has been raised as to the timing of the rescission under this paragraph.

purchase and either amend or create new agreements, we must point out that these amendments or agreements will also be subject to Chase approval. However, since we now have an understanding of Chase requirements this approval should come in a timely fashion.

Thank you for your cooperation and continued interest in our Midvale Park properties. We look forward to discussing this matter with you soon, but if we are unable to agree to an alternate resolution prior to July 31, 1989, we intend to rescind the existing agreements at that time.

By letter dated July 27, Equivest responded as follows:

Pursuant to your letter dated July 17, 1989, we are willing to agree to the following in order to obtain Chase Manhattan Bank's approval of the referenced transaction.

1. To sever the "Valencia" parcel option from the Midvale/Headley parcel option and the Valencia closing not being contingent on closing or proceeding with the Midvale/Headley option.

2. Equivest nor Estes shall be responsible or required to construct the improvements of Headley Road or Oaktree Drive.

We would like to simply amend the existing option agreements by deleting and/or adding the appropriate paragraphs.

Please have your attorney contact Sheldon Schwartz, Esq. at 212 685–9660 to discuss this further. Thank you.

On August 22, Estes sent Equivest the following letter:

We are in receipt of [Equivest's] letter of July 27, 1989 in which [it] suggests that the above referenced Agreements be amended to address Estes' concerns relative to Chase Manhattan Bank approval of the Agreements.

We are writing to advise that since Chase has been unwilling to consent (to several terms and conditions of the agreements, including participation in improving Oaktree Drive and Headley Road adjacent to the subject property) in a manner acceptable to Estes, Estes hereby rescinds the Agreements as provided under Paragraph 13.02 of the Agreements. Please find enclosed a full refund of the option consideration and be advised that escrow shall be deemed cancelled as of this date.

Several months later, Estes entered into an agreement with Evergreen and ultimately conveyed its interest in the Valencia property to Evergreen.

## PROCEDURE

On January 15, 1990, Equivest filed suit against Estes and its general partners seeking specific performance of the Valencia option agreement or, in the alternative, compensatory and punitive damages. Equivest also recorded a lis pendens against the Valencia property. On June 13, 1990, Evergreen filed a complaint for special action pursuant to A.R.S. § 33–420 seeking removal of the lis pendens and damages. The two actions were consolidated by stipulation of the parties, and a hearing was held on Evergreen's requested order to show cause on the special action complaint. By minute entry dated August 23, 1990, the trial court denied relief. Upon motion by Evergreen, the trial court entered judgment pursuant to Ariz.R.Civ.P. 54(b), 16 A.R.S., determining that "there was a contract between the parties, defendant Equivest Properties having accepted an offer of Estes Homes, predecessor-in-interest to plaintiff Evergreen West, Inc., to modify the Valencia Option Agreement, and therefore that the lis pendens should not be removed...." This appeal followed.

## ISSUES ON APPEAL

Evergreen's principal contentions are that 1) there was no substantial evidence in support of the trial court's finding that the lis pendens was not groundless because there was a meeting of the minds sufficent to modify the Valencia option agreement and therefore no basis for Estes's rescission, and 2) there was no substantial evidence that any such modification was enforceable in the absence of a formal writ-

ten amendment of the Valencia option agreement. Evergreen also argues that the trial court erred in awarding attorney's fees to Equivest.

## LAW AND ANALYSIS

■ A.R.S. § 33–420 provides in pertinent part:

A. A person purporting to claim an interest in, or a lien or encumbrance against, real property, who causes a document asserting such claim to be recorded or filed in the office of the county recorder, knowing or having reason to know that the document is forged, groundless, contains a material misstatement or false claim or is otherwise invalid is liable to the owner or beneficial title holder of the real property for the sum of not less than five thousand dollars, or for treble the actual damages caused by the recording or filing, whichever is greater, and reasonable attorney fees and costs of the action.

B. The owner or beneficial title holder of the real property may bring an action pursuant to this section in the superior court of the county in which the real property is located for such relief as is required to immediately clear title to the real property as provided for in the rules of procedure for special actions. This special action may be brought against a county recorder or any other recording official to compel him to remove a lien from the official records of the county based on the ground that the lien is forged, groundless, contains a material misstatement or false claim or is otherwise invalid. The owner or beneficial title holder may bring a separate special action to clear title to the real property or join such action with an action for damages as described in this section. In either case, the owner or beneficial title holder may recover reasonable attorney fees and costs of the action if he prevails.

In order to prevail in a statutory special action to remove a lis pendens, the plaintiff must establish that the defendant 1) has caused to be recorded a document, 2) in which he claims an interest in, or a lien or encumbrance against, real property, 3) which is forged, groundless, contains a material misstatement or false claim or is otherwise invalid.

Section 33–420 applies to the wrongful filing of a lis pendens. *Richey v. Western Pacific Development Corp.,* 140 Ariz. 597, 684 P.2d 169 (App.1984). Prior to the adoption of the statute, a lis pendens could be filed with impunity. Although subject to being quashed, a lis pendens was held to be privileged as being part of a judicial proceeding. *See generally Kelly v. Perry,* 111 Ariz. 382, 531 P.2d 139 (1975). The statute provides not only an expeditious procedure for removing a lis pendens within its purview but also provides for damages.

In the present case, Evergreen contends that the lis pendens was "groundless" because there was no meeting of the minds or writing sufficient to form a binding modification of the option agreements. These arguments go to the merits of the underlying action and therefore raise a question as to the scope of the trial court's inquiry in determining whether a lis pendens is groundless within the meaning of § 33–420(B). A.R.S. § 12–1191(A) authorizes the filing of a lis pendens by a plaintiff (or a defendant seeking affirmative relief) in any action "affecting title to real property." On its face, Equivest's complaint seeking specific performance of the Valencia option agreement is clearly an action affecting title to real property. Evergreen argues, however, that in determining whether the lis pendens is groundless under § 33–420, the trial court may look beyond the face of the complaint to the merits of the underlying claim, citing *Coventry Homes, Inc. v. Scottscom Partnership,* 155 Ariz. 215, 745 P.2d 962 (App. 1987). We believe that Evergreen misconstrues that decision.

*Coventry* involved a suit seeking damages for breach of contract and requesting that an equitable lien be imposed on certain real property. Coventry had entered into a contract with R.M. Properties under which Coventry agreed to assist R.M. in the development of certain property owned by

R.M. in exchange for a fixed management fee of $50,000 and an additional fee upon the sale of the property. R.M. later entered into an agreement to sell the improved property to Scottscom Partnership. Coventry and R.M. disputed the amount owed to Coventry under their agreement, and Coventry ultimately filed a materialmen's lien on the property claiming that it was owed $60,010. R.M. then recorded a statutory discharge of lien bond, thus fully securing Coventry's claim. The property was then conveyed to Scottscom. Coventry filed suit against R.M. for breach of contract and imposition of an equitable lien and also recorded a notice of lis pendens. After learning that the property had been conveyed, Coventry also joined Scottscom as a party. Scottscom then sought removal of the lis pendens under § 33–420, and the trial court granted its motion for summary judgment as to liability.

On appeal, Division One agreed with Coventry that an action to impose an equitable lien was one affecting title to real property. However, it rejected Coventry's argument that the trial court "may look no further than the action on its face to determine whether a lis pendens is groundless for purposes of A.R.S. § 33–420." 155 Ariz. at 218, 745 P.2d at 965. The court reasoned:

> We find that neither the purposes of A.R.S. § 12–1191 nor A.R.S. § 33–420 would be served by permitting parties to record a notice of lis pendens to recover a debt merely by characterizing the action as one seeking a constructive trust or equitable lien. There must be *some basis* for concluding that an equitable lien or constructive trust would be imposed on the real property subject to the notice of lis pendens....

> Based on the record in this case, the trial court could properly have interpreted the agreement between Coventry and R.M. to find that there was no intention that this real property was to be used as security for payment of R.M.'s contractual obligations to Coventry. Similarly, there was no relationship between Coventry and Scottscom concerning the real property. The trial court concluded that

there was no basis for the lis pendens following the order to show cause hearing. The court ordered the immediate release of the lis pendens. No appeal was taken from that decision. Therefore, in the subsequent summary judgment proceedings, the trial court could properly have determined, as a matter of law, that Scottscom established the first requirement of A.R.S. § 33–420, *i.e.*, that the filing of a notice of lis pendens under the circumstances of this case was groundless.

*Id.* at 218–219, 745 P.2d at 965–966 (emphasis supplied).

From *Coventry*, we glean two principles we believe to be applicable in cases under § 33–420 involving a lis pendens. The first is that the scope of the trial court's inquiry is limited to determining whether the action is one "affecting title to real property." A.R.S. § 12–1191(A). While some examination of the merits of the case may be required for this purpose, the action under § 33–420 is not intended to be an expedited hearing on the underlying action. The second principle is that the trial court need only find "some basis" for concluding that the action affects title to real property; it need not, and should not unless necessary to its decision, determine which party will prevail on the merits.

These conclusions are consistent with both the language and purpose of §§ 33–420 and 12–1191. The lis pendens statute is designed to give notice of claims to those with an interest in real property whose interest may be affected by the outcome of the litigation.

> The doctrine holds the subject matter of the litigation in custodia legis, ... thus preventing third persons from acquiring, during pendency of the litigation, interests in the property which would prevent the court from granting suitable relief or such as would vitiate a judgment subsequently rendered in the litigation.

*Mammoth Cave Production Credit Ass'n v. Gross,* 141 Ariz. 389, 391–392, 687 P.2d 397, 399–400 (App.1984). The need for

such protection is evident in an action for specific performance, where a conveyance in the absence of a lis pendens would render meaningless a judgment in plaintiff's favor. The purpose of § 33–420 was not to undermine the protection afforded to plaintiffs under § 12–1191, but rather to provide defendants with an expeditious means of removing a lis pendens which is not authorized by that statute. But a plaintiff is not prohibited from recording a lis pendens merely because he may lose on the merits of his action, and it is this which must be kept in mind when construing the meaning of the term "groundless" as used in § 33–420.[2]

Black's Dictionary equates the term "groundless" with the term "frivolous." Black's Law Dictionary at 704 (6th ed. 1990). "A claim ... is frivolous if a proponent can present no rational argument based upon the evidence or law in support of that claim...." *Id.* at 668. *Cf. Willow Creek Leasing, Inc. v. Bartzen,* 154 Ariz. 339, 343, 742 P.2d 840, 844 (App.1987) (a frivolous appeal is one "totally and completely without merit."); *State v. Van Dorn,* 8 Ariz.App. 228, 230, 445 P.2d 176, 178 (1968) ("without merit and futile"). Other jurisdictions have similarly defined the term "groundless." *See, e.g., Western United Realty, Inc. v. Isaacs,* 679 P.2d 1063, 1069 (Colo.1984) ("a claim ... is groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial"); *Kahn v. Cundiff,* 543 N.E.2d 627 (Ind.1989); *C.S.R., Inc. v. Industrial Mechanical, Inc.,* 698 S.W.2d 213, 217 (Tex. App.1985) ("no arguable basis"). "A suit does not become legally groundless merely because plaintiffs fail to convince the jury of the truth of their allegations." *LaChance v. McKown,* 649 S.W.2d 658, 661 (Tex.App.1983). *Accord, Western United Realty, supra; Kahn v. Cundiff, supra.*

In sum, we conclude that the purpose of A.R.S. § 33–420 is to permit the expeditious removal of a lis pendens alleged to be groundless only where the claim that the underlying action is one affecting title to real property has no arguable basis or is not supported by any credible evidence. Further, while this determination may require the trial court to look beyond the pleadings, it should not involve a decision on the merits of the underlying action. Upon a showing that the claim has "some basis," *Coventry, supra,* the lis pendens should remain in effect until a trial on the merits.

■ Applying this standard to the present case, we have no difficulty in concluding that Evergreen failed to establish that Equivest's claim that its action for specific performance is one affecting title to real property has no arguable basis or is not supported by credible evidence. Equivest is the optionee under agreements executed by Estes, Evergreen's predecessor in interest, which Estes could rescind only under certain specifically defined circumstances. If Equivest prevails on its claim that the parties agreed to a modification of the option agreements, thus depriving Estes of any basis for rescission, and otherwise establishes that it is entitled to specific performance (a question not addressed in the trial court or here), the action is clearly one affecting title to real property.

The difficulty presented by this case is that, in denying Evergreen's requested relief, the trial court did more than simply find that the lis pendens had an arguable basis. Its decision is based on a determination of one aspect of the merits of Equivest's claim, that is, that Equivest's letter of July 27, 1989, constituted an acceptance of Estes's offer to modify the option agreements, thus precluding Estes from rescinding the agreements. This resulted from the fact that the only basis for Evergreen's claim for removal of the lis pendens was that Equivest's interest in the property de-

---

**2.** No contention is made here that the lis pendens is forged or contains a material misstatement. The allegation that the lis pendens contains a false claim or is otherwise invalid has as its predicate the same basis as the allegation that it is groundless: the absence of an agreement modifying the options and negating Estes's right to rescind, i.e., Evergreen's defense to the action on its merits.

rived solely from the option agreements which had been rescinded by Estes and that this rescission was proper because Equivest had not accepted Estes's offer to modify the agreements but rather had made a counteroffer. Evergreen thus consented to the trial court's determination of this issue, *cf. Thomas v. Goudreault*, 163 Ariz. 159, 786 P.2d 1010 (App.1989), and avowed at oral argument before this court that it had no additional evidence to present on this issue. Thus we are required to determine whether there was substantial evidence to support the trial court's decision. *Pugh v. Cook*, 153 Ariz. 246, 735 P.2d 856 (App.1987).

As our supreme court recently stated in *Hill–Shafer Partnership v. Chilson Family Trust*, 165 Ariz. 469, 799 P.2d 810, 814 (1990):

It is well-established that before a binding contract is formed, the parties must mutually consent to all material terms. A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent.

Evergreen contends that Estes's intent in making the offer contained in the July 17 letter was "to eliminate entirely Estes' responsibility for the improvement costs and to throw the burden on Equivest." It contends that Equivest's response varied materially from Estes's offer in two ways. First, it specified that neither Estes nor Equivest would be responsible for constructing the improvements. Second, "Estes had not proposed to affirmatively eliminate the requirement that the roads be constructed; rather, it proposed that the agreements be silent on the topic except to specify that Estes would bear no financial responsibility for the construction." Evergreen acknowledges that, as successor in interest to Estes, Equivest would be bound by the provisions of the annexation agreements and development standards. It argues, however, that without a specific provision in the option agreements placing the entire burden of the costs of construction

on Equivest, the latter could require the city to look only to Estes to pay for the construction of the roads.[3] We disagree.

█ We note initially that both the July 17 letter from Estes and the July 27 response from Equivest deal solely and specifically with amendments to the option agreements; neither letter refers to the annexation agreement or the development standards. Second, notwithstanding Evergreen's assertions to the contrary, Estes's letter expressly offers to "delete from the Agreements all provisions regarding the construction of Headley Road and Oaktree Drive...." Deleting those provisions necessarily relieves *both* parties of the construction costs *under the terms of the option agreements*. Thus Equivest's response was entirely consistent with Estes's offer to amend the agreements.

Moreover, deleting those provisions from the option agreements does not, nor could it, relieve either party of its obligations under the annexation agreement and the development standards. The annexation agreement defines the parties to include "their respective ... successors ... and assigns." The development standards apply to "the Developer or its designated assigns (hereinafter the "Developer")." Estes remains subject to the improvement cost provisions of those agreements regardless of the terms of the option agreements. More importantly, so does Equivest. Upon exercise of its option and commencement of development of the property, Equivest, as a successor in interest to Estes, would be obligated to pay the cost of any improvement required by the city under the provisions of the annexation agreement and the development standards. Thus, even assuming, as Evergreen contends, that Estes's unexpressed intention was that "the Agreement merely be silent so that Equivest would succeed to Estes' obligations under the Annexation Agreement and Development Standards by operation of law," that objective was fully satisfied by Equivest's response, considered in

---

**3.** At oral argument, counsel admitted that Estes was not seeking to add a provision to the option agreements stipulating that Equivest would in-

demnify it in the event the city sought to impose construction costs on Estes.

light of the fact that the option agreements were made expressly subject to Estes's agreements with the city.

Evergreen also argues that, even if there was mutual assent to the terms of the modification, no enforceable agreement existed until the modification was reduced to writing. This issue was not raised or argued below and cannot be asserted for the first time on appeal. *Dillon–Malik, Inc. v. Wactor*, 151 Ariz. 452, 728 P.2d 671 (App. 1986). The only testimony pertaining to this issue came from Doug Noll, the author of the July 17 letter, concerning the purpose of his statement in the letter that "[i]f we come to a meeting of the minds on how to resolve this proposed purchase, and either amend or create new agreements, we must point out that these amendments or agreements will also be subject to Chase approval." When asked why this provision was included, Noll testified:

> I was very concerned about the entire section six in the option agreement; they're very comprehensive, and I wanted to make sure that we created a new agreement that clearly defined the fact that Chase nor Estes had any obligations were those outside of the improvements that were the obligations of the developement [sic] of those and the annexation developements [sic] with the City of Tucson.

While it is true that section six of the option agreements is indeed comprehensive, Equivest agreed to Estes's offer to delete them entirely. It also agreed to relieve Estes, and therefore Chase, of any obligation under the option agreements to pay the costs of construction. Thus, what little evidence Evergreen presented on this issue fails to establish that there was any lack of agreement on any term material to Estes.

In sum, we find that in all material respects, Equivest's July 27 letter did not vary materially from the terms set forth in Estes's July 17 letter. The trial court therefore correctly concluded that Estes's offer had been accepted and that the parties had made a binding agreement regarding modification of the option agreements.

We also affirm the trial court's award of attorney's fees and costs pursuant to the terms of the option agreements.

Affirmed.

FERNANDEZ, Chief Judge, specially concurring.

I concur in the result solely because of Evergreen's representation at oral argument that it had presented all its evidence at the hearing on the order to show cause on the issue of whether a binding contract had been entered into between Estes and Equivest. I believe, however, that when a trial court is asked to remove a lis pendens, it should determine only the issue whether the lien is "forged, groundless, contains a material misstatement or false claim or is otherwise invalid." A.R.S. § 33–420. A determination on the merits of any other issue should await completion of discovery and full presentation of the issues.

HATHAWAY, Judge, dissenting.

At the heart of this problem lies the contractual agreement between Estes and the City of Tucson. No matter what Estes/Evergreen/Chase and Equivest decide among themselves, the development standards required by Tucson will have to be met. Someone will have to build the roads.

Even though the trial court and the majority of this court find that Estes and Equivest came to a "meeting of the minds" on the proposed modification to the option agreements, I cannot agree, nor did Estes as the offeror of the modification. Estes had the right to rescind the agreements, at its sole discretion, based upon Chase's only conditional acceptance of the agreements. It is not hard to imagine a scenario in which Equivest, as Estes' successor-in-interest and developer of the property, builds the roads required by Tucson and then seeks indemnification from Estes, claiming under the modification that its predecessor-in-interest agreed it would not have to build the roads. Why else would Equivest want Estes to promise not to require Equivest to be responsible for the roads?

Even if this court proclaims that a valid modification existed between the parties, the agreements as revised will have to be resubmitted for Chase's approval, which will, if conditional, in turn be rescindable by Estes at its sole discretion, thus making this whole discussion a mere bagatelle.