540 P.2d 704

William F. GIFFORD and Susan E. Gifford, husband and wife, Appellants,

v.

Peter Robert MAKAUS, Trustee, Appellee.

No. 11734.

Supreme Court of Arizona, In Division.

Oct. 8, 1975.

Robert P. Davidson, Scottsdale, for appellants.

James L. DeSouza, Phoenix, for appellee.

CAMERON, Chief Justice.

This is an appeal from a judgment of the Superior Court of Maricopa County which denied the specific performance of a contract of sale of real estate which the appellant-buyers, William and Susan Gifford, sought to enforce against the appellee-seller, Peter Makaus.

We are called upon to determine:

1. Was the option contract sufficient to be enforceable and was there a valid exercise of that agreement by the Giffords?

2. Was there a binding contract between the parties?

The facts necessary for a determination of this matter on appeal are as follows.' Matthew J. Makaus and Gladys M. Makaus created a trust on 5 April 1967 and their son, Peter Robert Makaus, was named as trustee. The trust encompassed the real property which is the subject of this action. Notwithstanding this trust, Matthew Makaus, on 25 July 1970, entered into an agreement with Bill Gifford, Inc., for the lease of the property. The lease was for two years commencing 1 August 1970 and contained a provision against subletting in "whole or any part" and further contained an option to purchase:

"* * * for Twenty Eight Thousand ($28,000.00), terms Five Thousand Dollars ($5,000.00) or more down, balance payable Two Thousand Dollars ($2,000.-00) a year or more, plus interest at seven (7) percent annually on the unpaid balance; the escrow to be set up with Arizona Title Guarantee & Trust Co."

The lease was signed by William Gifford and Matthew J. Makaus. Thereafter by an undated instrument the lease was assigned by Bill Gifford, Inc., to William F. Gifford and Susan E. Gifford, husband and wife.

On 26 November 1970, Matthew Makaus died and his son and trustee continued to receive the payment of rents from William and Susan Gifford. Notwithstanding the prohibition in the lease against subletting, the Giffords sublet part of the property with the result that the subtenant built on the property and caused a mechanic's and materialman's lien in the amount of $4,120.00 to be filed against the property. William Gifford testified that he had obtained permission to sublease a week before Matthew Makaus died and Peter Makaus testified he knew nothing about it at the time, but admitted he did nothing after he found out about the sublease. During the term of the lease a City of Phoenix paving lien assessment in the amount of $3,044.76 was also filed against the property.

Prior to the termination of the lease the Giffords indicated their interest of exercising the option to purchase. The Giffords opened an escrow with Arizona Title Insurance and Trust Company. The instructions provided that the seller was to pay all liens including the City of Phoenix paving assessment and the mechanic's lien. These instructions were signed by the Giffords and a Norman Rudd though Rudd was not indicated as a party on the face of the escrow. William Gifford testified as to Norman Rudd's authority as follows:

"Q  BY MR. DAVIDSON: I hand you, Mr. Gifford, Plaintiff's Exhibit 6 which is in evidence and is Escrow Instructions, and ask if you will examine that instrument and turn it over on the back. Does it contain your signature?

"A  Yes.

"Q  Does it contain the signature of your wife?

"A  Yes.

"Q  Also, it contains a third signature, is that correct?

"A  Right.

"Q  Whose signature is that?

"A  My agent.

"Q  What is his name?

"A  Norman Rudd."

Peter Makaus refused to sign these instructions but instead had new escrow instructions prepared which provided that the Giffords were to take the property subject to existing liens, the paving lien to be prorated. As to the new escrow instructions, Peter Makaus signed them as did Norman Rudd who signed as a buyer along with the Giffords. Mr. Rudd testified:

"Q  Did Mr. Gifford sign those in your presence?

"A  Yes, he did.

"Q  Did you sign it also?

"A  Yes, I did.

\*  \*  \*  \*  \*  \*

"Q  BY MR. DAVIDSON: After you signed them what did you do with them?

"A  I called the real estate broker, Mrs. Brummett, with the Ray Makaus Land Company in Kingman for advise of change in connection with the improvement assessments, and also the mechanic's lien that is written into these contracts.

"Q  Then after calling her what did you next do with the escrow instructions?

"A  Under her advise I delivered these back to Don Adams' office in person which Mr. Adams was not in his office, with instructions to his secretary to hold until further notice, that I would call and give her further instructions.

"Q  Now, why did you sign and deliver it back to the title company?

"A  Well, the reason that it was signed and delivered back to the title company was to meet the deadline in

the original openings of contract so that in case we did accept this they would be in the hands of the title company by the deadline written into the original contract.

"Q Now, after you delivered these to Don Adams' secretary and told her to hold them, did you have any other conversations with Don Adams or his secretary subsequent to that?

"A Later in the day.

\* \* \* \* \* \*

"Q Right, then the second time?

"A The second time I reached Don Adams and I told him to withdraw the papers, that I would not—that we would not accept them.

\* \* \* \* \* \*

"THE COURT: \* \* \* Later in the same day you told Don Adams what, now?

"A Withdraw these papers.

"THE COURT: Exhibit 8, because what?

"A Well, I had gone by to see—

"THE COURT: What did you tell Don Adams? That's what I am interested in.

"A I had told Don Adams to withdraw this document, these instructions.

"THE COURT: What reason did you give him for doing so?

"A Mr. Thiele was going to move from the property, and there was a $1400 mechanic's lien on the property that was not cleared up."

The Giffords had placed $100 in escrow at the time the original escrow instructions were prepared and this amount was carried over to the second escrow instructions. The balance of $4,900 under the terms of the option and the escrow instructions was never paid into escrow. When the Gif-

fords failed to deposit the $4,900 in escrow, Peter Makaus, on 25 August, directed the title company to mail a 13-day cancellation notice which was mailed on 28 August. Complying with the regulations of the title company, Peter Makaus signed all papers necessary to complete the transaction on his part including the deed to the property and an agreement for sale under the terms set forth in the second escrow instructions. The notice was mailed and contained the following provision:

"Due to the failure of the \* \* \* *buyers* to comply with the terms thereof within the time limit provided therein, the undersigned hereby demands that the \* \* \* *buyers* comply with the terms thereof within thirteen days from the receipt of the notice by the Escrow Agent, or said Escrow shall thereupon become cancelled."

The Giffords failed to comply with this notice and the escrow was cancelled on 13 September 1972. The Giffords then sued for specific performance standing upon the original escrow instructions, their complaint alleging:

"Because of defendant's default and refusal to abide by the terms of the contract as attached hereto and marked Exhibit 'A', and because of his refusal to execute a deed to said premises free and clear of encumbrances, plaintiffs file this complaint in equity for specific performance of said contract by defendant, plaintiffs having no adequate remedy at law."

And praying:

"WHEREFORE, plaintiffs pray as follows:

"1. For judgment and decree against defendant for specific performance of said contract, and requiring the execution and delivery by defendant of a clear and unencumbered title to said real property to plaintiffs by defendant, \* \* \*."

## WAS THE OPTION CONTRACT ENFORCEABLE?

The trial court found as follows:

"The Court has carefully considered this matter and has come to the conclusion that the option contract is not sufficiently definite to be enforceable. * * *"

On appeal the facts will be viewed most favorably to sustaining the judgment of the trial court, *Arizona Cotton Ginning Co. v. Nichols,* 9 Ariz.App. 493, 454 P.2d 163 (1969), and the burden is upon the plaintiffs to prove there was a valid option contract. *Malcoff v. Coyier,* 14 Ariz.App. 524, 484 P.2d 1053 (1971). We have stated:

"It is elementary that before there can be a binding contract there must be mutual consent of the parties to the terms thereof. (citations omitted) There must be a distinct intention common to both and without doubt or difference and until all understand alike there can be no assent. In the instant case there was no distinct intention common to both; the parties did not understand alike and therefore there was no assent. We hold the trial court did not err in concluding that there was no meeting of the minds and for that reason the option to renew was void." *Heywood v. Ziol,* 91 Ariz. 309, 314, 372 P.2d 200, 203 (1962).

We believe in the instant case that there was no distinct intention common to both and the trial court was correct in finding there was no valid option contract. Although there was a general intent to sell the property, the parties did not understand alike as to the other terms particularly the treatment of the lien.

There is, however, another reason why the option contract is not enforceable under the facts in this case. Assuming a valid option contract for sale of property, it does not appear that the option was validly exercised by the Giffords.

The Giffords contend that the option was unambiguous and that they have made a valid exercise of that option. The Giffords in their brief state:

"When boiled down to its simplest terms, the defendant recognizes the obligation entered into by his father as lessor, but is merely trying to obtain an additional $7,164.76 for the property by arguing that the plaintiffs should assume encumbrances against the property as part of a new purchase price."

This statement ignores the fact that $4,120 of the $7,164.76 is the result of a lien created by the failure of the Giffords' subtenant to pay for construction on the land. The Giffords then attempted to add a new and unforeseen condition to the exercise of the option—that the seller pay the liens incurred by the Giffords' subtenant. The option agreement cannot be contorted to provide that the purchase price agreed upon by the parties was then to be reduced by the amount of any lien on the property incurred during the term of the lease by the Giffords or their subtenant. We therefore hold that the first escrow instructions did not constitute a valid exercise of the option contained in the lease.

## WAS THERE AN AGREEMENT TO SELL?

The second escrow instructions were prepared under the direction of Peter Makaus and were in effect an offer to sell by him. This offer was never accepted by the Giffords for two reasons:

1. First the testimony indicates that there was a conditional delivery of the instructions by the Giffords' agent, Rudd. Admittedly, the Giffords did sign the agreement but the testimony of Norman Rudd, their agent, indicates that this offer was rejected and the Giffords did nothing to correct that situation after they received the 13-day notice. Also, by the complaint, it is apparent that the Giffords never agreed to the terms of the second escrow

instructions since they demanded that the seller absorb the amount of both the mechanic's lien and the full amount of the paving assessment.

2. There was never any compliance with the requirement in the escrow instructions for the $5,000 down payment. There was no tender of this amount into escrow either before or after the 13-day notice.

The evidence as well as the pleadings indicate that the Giffords never accepted the offer to purchase as extended in the second escrow instructions. The Giffords rejected this offer and continued to reject as the language in their complaint indicates.

Judgment affirmed.

STRUCKMEYER, V. C. J., and HAYS, J., concur.