NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

TALKING ROCK LAND, LLC,
*Plaintiff/Appellant/Cross-Appellee,*

*v.*

INSCRIPTION CANYON RANCH, LP, et al.,
*Defendants/Appellees/Cross-Appellants.*

No. 1 CA-CV 22-0712
FILED 4-9-2024

---

Appeal from the Superior Court in Maricopa County
No. CV2019-056128
The Honorable Sara J. Agne, Judge
The Honorable Danielle J. Viola, Judge

**AFFIRMED**

---

COUNSEL

Himmelstein & Adkins, LLC, Scottsdale
By David E. Shein, Erik D. Smith
*Counsel for Plaintiff/Appellant/Cross-Appellee*

Stinson LLP, Phoenix
By Lonnie J. Williams, Jr., Timothy S. Lauxman
*Co-Counsel for Defendant/Appellee/Cross-Appellant*

Holdsworth Law Firm, P.C., Prescott
By Lori Marschke
*Co-Counsel for Defendant/Appellee/Cross-Appellant*

---

## MEMORANDUM DECISION

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge Paul J. McMurdie joined.

---

**T H U M M A**, Judge:

**¶1**　　　　In this declaratory judgment action, plaintiff Talking Rock Land (TRL) appeals from the grant of summary judgment for defendant Inscription Canyon Ranch (ICR) about the meaning of certain terms of the parties' detailed written contracts. ICR cross-appeals, arguing the superior court erred in reducing the attorneys' fees it sought under the contracts, an issue addressed in a separate opinion. For the reasons that follow, the judgment is affirmed.

## FACTS AND PROCEDURAL HISTORY

**¶2**　　　　TRL and ICR have had a contractual relationship, lasting a generation, involving the development of homes on land near Prescott. In 1999, TRL entered into a contract with ICR, the original owner of 3,450 acres (more than five square miles) of undeveloped land. TRL would purchase land from ICR in phases (subject to annual minimum purchase requirements) and develop residential lots as part of a master-planned golf community. TRL would develop the community, including amenities and infrastructure, and sell homes to consumers.

**¶3**　　　　The parties amended the underlying contracts many times. As relevant here, in 2010, they converted a prior contract into two interconnected contracts: (1) a "2010 Amended and Restated Option Agreement" (2010 Agreement) and (2) a "2010 Amended and Restated Trust Agreement" (2010 Master Trust). In the years that followed the 2010 changes, TRL and ICR amended the 2010 Agreement numerous times. Although the 2010 Master Trust is an important part of the contractual relationship, the terms of the 2010 Agreement and a subsequent amendment called the Sixth Addendum provide the primary basis for this dispute.

¶4            The parties' contractual relationship appears to have been largely uneventful until the mid-2010s. By the end of 2015, given purchase requirements and a change in demand for homes, TRL claimed it had acquired a 15-year inventory of lots. This resulted in the parties negotiating and, in 2015, agreeing to a Sixth Addendum to the 2010 Agreement.

¶5            TRL's concerns about an oversupply of lots and market demand persisted. In November 2018, TRL notified ICR of its decision not to buy more lots. ICR responded that, under Section 7 of the Sixth Addendum, TRL's decision did not relieve it of its obligation to acquire all lots under the 2010 Agreement before the end of 2027, representing more than 1,500 lots at a total cost to TRL of $10,000,000.

¶6            Unable to resolve their dispute, in August 2019, TRL filed this declaratory judgment action. TRL sought a judgment that, under the parties' contracts, it was "entitled to 'elect, by written notice to [ICR] . . . not to proceed with' further purchases." ICR counterclaimed, seeking a declaration that the 2010 Agreement "does not excuse TRL from its obligation under the Sixth Addendum to continue purchasing lots through 2027." After the court denied ICR's motion for judgment on the pleadings, and after discovery, the parties filed cross-motions for summary judgment.

¶7            After oral argument and taking the matter under advisement, the court found for ICR in an eight-page minute entry, concluding "[t]he plain language does not grant TRL an option to stop buying lots" or to stop "complying with obligations under the parties' agreement." The court rejected TRL's argument that the Sixth Addendum was not binding because "there was no meeting of the minds" and TRL "did not receive any consideration."

¶8            After TRL unsuccessfully moved for reconsideration, the court entered final judgment declaring that the contract required TRL to pay for all the lots "prior to the end of 2027" and awarding ICR $ 700,000 in attorneys' fees pursuant to the 2010 Agreement and Arizona Revised Statute (A.R.S.) §12-341.01(2024)[1] and $14,262.14 in taxable costs. This court has jurisdiction over TRL's timely appeal and ICR's timely cross-appeal pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§12-120.21(A) and -2101(A)(1).

---

[1] Absent material revisions after the relevant dates, statutes cited refer to the current version unless otherwise indicated.

**DISCUSSION**

**¶9**         TRL argues the superior court erred by (1) concluding the plain language of the Sixth Addendum allowed entry of summary judgment; (2) improperly relying on parol evidence; (3) rendering material contract provisions ineffective; (4) improperly creating or necessitating new contract provisions; (5) concluding there was mutual assent between TRL and ICR for the Sixth Addendum; and (6) finding that there was adequate consideration supporting the Sixth Addendum.

**I.      Standard of Review.**

**¶10**         "The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). This court reviews the entry of summary judgment de novo, "viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion," *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003), to determine "whether any genuine issues of material fact exist," *Brookover v. Roberts Enter., Inc.*, 215 Ariz. 52, 55 ¶ 8 (App. 2007). An order granting summary judgment will be affirmed if it is correct for any reason. *Hawkins v. State*, 183 Ariz. 100, 103 (App. 1995).

**¶11**         Under Arizona law, "the interpretation of a contract is a question of law, which this court reviews de novo." *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593 ¶ 9 (App. 2009). In interpreting a contract, the court "first consider[s] the plain meaning of the words in the context of the contract as a whole." *Id.* at 222 Ariz. at 593 ¶ 9. The court construes a contract "in its entirety and in such a way that every part is given effect." *Cardon v. Cotton Lane Holdings, Inc.*, 173 Ariz. 203, 207 (App. 1992). The court reads words "in the context in which they are used, and [considering] the purposes sought . . . by the agreement." *Emp. Sec. Comm'n v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.*, 22 Ariz. 54, 58 (1974). The court applies "a standard of reasonableness" to contract terms, reflecting "the parties' intent." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 175 Ariz. 273, 277 (App. 1993); *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152 (1993). If the text is unambiguous, the court applies the language as written. *Grosvenor*, 222 Ariz. at 593 ¶ 9. The parties' disagreement about the meaning of contract terms does not, by itself, create an ambiguity. *See United Cal. Bank v. Prudential Ins. Co of Am.*, 140 Ariz. 238, 259 (App. 1983). Applying these standards, TRL has shown no error.

## II.    The Contractual Relationship.

¶12        The two documents relevant to this appeal are the 2010 Agreement and the Sixth Addendum, created in 2015. These documents are part of a larger, complex set of contracts that has governed the parties' relationship over the years. In part, this litigation arises out of changes the Sixth Addendum made to the 2010 Agreement.

¶13        The 2010 Agreement identifies two distinct but interrelated trusts (1) the Master Trust and (2) Junior Trusts. All property subject to the 2010 Agreement is first held in the Master Trust in what the parties call "Un-Converted Phases," which are phases that remain titled in the Master Trust. The 2010 Agreement provided that the term "'**Phase**' shall mean each phase identified in the Project/Phasing Map." The Project/Phasing Map, in turn, identifies the size, number of lots and location of each phase.

¶14        When TRL seeks to develop certain land, it gives written notice to ICR to move or "convert" land held by the Master Trust as Un-Converted Phases to Junior Trust(s) and the land becomes a "Converted Phase." Once phases are converted, meaning they are moved from the Master Trust to a Junior Trust, they are "Converted Phases." TRL then becomes obligated to purchase the lots within the Converted Phase. Once ICR receives the required payment, ICR secures the release of all remaining lots in a particular Junior Trust. In an "Option Extension" provision, the 2010 Agreement extended the duration of an option for TRL to convert phases through December 31, 2019. Specifically, and as discussed below, that Option Extension stated that TRL had an "option to purchase the Trust Property (through exercise of its option to convert all Un-Converted Phases to Converted Phases)." The exercise of the option by TRL would mean the property would be moved from an Un-Converted Phase held in the Master Trust to Converted Phases held in a Junior Trust.

¶15        TRL had an annual obligation to purchase a minimum number of Lots as stated in Section 4.3 of the 2010 Agreement. The 2010 Agreement defined "Lot" as "each unsold platted residential lot now or hereafter located in a Converted Phase and titled in a Junior Trust or in TRL." Section 4.3 states "TRL shall pay Base Lot Release Payments with respect to a minimum number of Lots" for an "Accounting Year," which is a calendar year.[2] Section 4.3 provides TRL's compliance with this minimum purchase requirement was based on Lots that were moved to Converted

---

[2] The Base Lot Release Payments varied, ranging from $25,000 per Lot to $0 per Lot, depending upon the number of Lots released.

Phases held in Junior Trusts. If TRL satisfied the Annual Performance Covenant, its option to convert phases remained in good standing.

¶16       Section 1.3 of the 2010 Agreement allowed TRL to elect not to convert more land from the Master Trust to a Junior Trust, thereby ending TRL's obligation to purchase Converted Phases. As applicable here, the 2010 Agreement grants "TRL with an option and not an obligation to convert Un-Converted Phases to Converted Phases . . . . Notwithstanding anything to the contrary contained in this [2010] Agreement, TRL may at any time during the [existence of the option] elect, by written notice to ICR and the Trustee, not to proceed with establishing any further Converted Phases . . . ."

¶17       With this background, the primary issue in this appeal is what, if anything, the Sixth Addendum did to change these obligations contained in the 2010 Agreement.

¶18       The Sixth Addendum was the product of lengthy and extensive negotiations, including using the defined term "Lots." In the end, the 22-page Sixth Addendum, signed in 2015, significantly changed the parties' agreement, provided newly defined terms and definitions, and noted that its terms "shall be controlling with respect to any conflicting or inconsistent provision in the" 2010 Agreement.

¶19       The Sixth Addendum made six changes to the 2010 Agreement that are particularly important. *First,* Section 5 removes the requirement that TRL use Junior Trusts -- therefore making it possible for TRL to purchase Un-Converted phases directly from the Master Trust. *Second,* Section 3 allows TRL to satisfy its Annual Performance Covenant "by directly purchasing entire Un-Ripe Converted Phases and or Un-Converted Phases, without utilizing the Junior Trust conversion mechanism." *Third,* the Sixth Addendum adds the concept of a "Density Unit," which was not referenced in the 2010 Agreement. *Fourth,* Section B clarifies that "'Lots' and 'lots' may be used interchangeably, and **'Density Unit'** shall mean a lot or parcel whether planned or platted (unless otherwise specified)." The change means that the term "Density Unit" is much broader than Converted Phases and encompasses lots in *both* the Master Trust *and* Junior Trusts. *Fifth,* Section 6 extended the parties' agreement to "the earlier of (i) December 31, 2027; or (ii) the date ICR has received Base Lot Release Payments for all Density Units (platted or planned) subject to the" 2010 Agreement. *Sixth,* Section 7 modified Section 4.3 of the 2010 Agreement.

¶20      In its entirety, Section 7 states (with brackets added to number the sentences for ease of reference):

> [1] The minimum annual Density Unit takedown requirements under Section 4.3 of the Existing Option Agreement ("**Annual Performance Covenant**") and the Base Lot Release Payment schedule under Section 4.1 of the Existing Option Agreement are hereby updated as set forth on **Exhibit B** to this Addendum ("**Amended Takedown & Payment Schedule**"). [2] If the total number of planned and/or platted Density Units within the Development Agreement Property ultimately exceeds 1,653 Density Units (collectively, "**Excess Lots**"), then the Base Lot Release Payment for each Excess Lot acquired by TRL under the Option Agreement will be $25,000. [3] Base Lot Release Payments must be paid for all planned and/or platted Density Units within the Development Agreement Property (including Excess Lots, but excluding the Removed Property) prior to the end of 2027. [4] The parties acknowledge and agree that Supplemental Lot Release Payment requirements (as amended in Section 14 of this Addendum) shall apply to any and all Density Units released to or at the direction of TRL, including Excess Lots, and shall survive expiration of the extended Option Term.

By amending the Annual Performance Covenant, Section 7 of the Sixth Addendum allows TRL to meet its annual minimum purchase requirements by purchasing Density Units, rather than solely through the purchase of Converted Phases as the 2010 Agreement had required.

### III.     The Plain Language of the 2010 Agreement and the Sixth Addendum Impose a Purchase Obligation on TRL.

¶21      TRL's argument on appeal is premised on a position that "Section 7 of the Sixth Addendum is not a 'new' provision and does not evidence the creation of a 'new' obligation." Instead, TRL argues, "Section 7 of the Sixth Addendum is expressly an 'update' of the 'Annual

Performance Covenant' contained in Section 4.3 of the" 2010 Agreement. To the extent that TRL suggests the "update" is something different than a "modification," TRL's brief refers to update and modification synonymously. Moreover, Section 7 expressly updated Section 4.3, but that fact does not lead to the conclusion TRL asserts here.

¶22          Section 7 of the Sixth Addendum states, "the minimum annual Density Unit takedown requirement under Section 4.3 of the [2010 Agreement] and the Base Lot Release Payment schedule under Section 4.1 of the [2010 Agreement] are hereby updated." This express language -- Section 7 modifying the Section 4.3 obligations – negates TRL's argument that "Section 4.3 of the [2010 Agreement] and Section 7 of the Sixth Addendum are functionally identical." If these two provisions of these two contracts signed five years apart were "identical," including Section 7 in the Sixth Addendum would be superfluous. *See Hanson v. Tempe Life Care Vill., Inc.*, 216 Ariz. 26, 27 ¶ 7 (App. 2007) (noting courts "interpret contracts to give effect to all their parts"). Similarly, TRL's argument that the parties' relationship is governed by the 2010 Agreement, and not the Sixth Addendum, is counter to the provision in the Sixth Addendum that "[i]n the event of any conflict or inconsistency between the terms of" the Sixth Addendum and the 2010 Agreement, "the terms of this [Sixth] Addendum shall control."

¶23          TRL claims that "the only substantive change between the Performance Covenant set forth in Section 4.3 of the [2010 Agreement] and the 'updated' Performance Covenant set forth in Section 7 of the Sixth Addendum" is changing "shall" to "must" for the Base Lot Release Payments due each Accounting Year. But, contrary to TRL's argument, Section 7 made other substantive changes as applicable here.

¶24          Section 7 profoundly changed what type of phase -- Converted Phases or Density Unit -- is covered by the Annual Performance Covenant. Section 4.3 of the 2010 Agreement states: "pay Base Lot Release Payments with respect to a minimum number of lots (across all ***Converted Phases***)," while Section 7 of the Sixth Addendum, in sentence [1], begins by declaring: "The minimum annual ***Density Unit*** takedown requirements under Section 4.3 [of the 2010 Agreement] . . . are hereby updated." (Emphasis added.)

¶25          Section 7's changes to the 2010 Agreement do not end there. Section 7 added the concept of a "Density Unit," which is not referenced in the 2010 Agreement. Although not defined in Section 7, the first page of the Sixth Addendum declares: "As used in this Addendum, 'Lots' and 'lots'

may be used interchangeably, and '**Density Unit**' shall mean a lot or parcel whether planned or platted (unless otherwise specified)." When reading Section 7 with the definition of Density Unit in the Sixth Addendum, the new obligation imposed on TRL in the Sixth Addendum is clear, as specified in sentence [3] of Section 7: "Base Lot Release Payments must be paid for all planned and/or platted [Lots or Parcels] within the Development Agreement Property . . . prior to the end of 2027." The parties, by including the new concept of a "Density Unit" and defining the term broadly, and then including sentence [3] of Section 7, agreed in the Sixth Addendum that TRL had a new purchase obligation.

**¶26**        This obligation is supported by other language in the Sixth Addendum. Section 8(a) of the Sixth Addendum uses parallel language, stating that "[i]f the maximum allowable density under the Development Agreement is less than 1,653, then . . . [it] shall have no effect on the *obligation* of TRL to pay Base Lot Release Payments (and if applicable, Catch Up Payments) for a minimum of 1,636 Density Units on or before the expiration of the Option Term." (Emphasis added.) Section 6 of the Sixth Addendum extends the "Option Term" to "the earlier of (i) December 31, 2027; or (ii) the date ICR has received Base Lot Release Payments for all Density Units (platted or planned) subject to the Option Agreement ('**Extended Option Term**')." Thus, Adopting TRL's argument that Section 7 does not impose any obligation would require the court to ignore the express requirements in sentence [3] of Section 7 as well as Section 8(a), something this court will not do. *See Chandler Med. Bldg. Partners*, 175 Ariz. at 277 ("the court will not construe one provision in a contract so as to render another provision meaningless").

**¶27**        TRL, in seeking summary judgment and now on appeal, mischaracterizes its "option" under the 2010 Agreement as having been modified by the Sixth Addendum. TRL argues it has "the 'option' but not the 'obligation' to purchase portions of the Master Trust Property." Given this "option," TRL asserts, the superior court's conclusion that "the Sixth Addendum imposed an 'obligation' on TRL to pay Base Lot Release Payments for all Density Units prior to 2027" is "irreconcilably at odds" with the provisions of the 2010 Agreement and the Sixth Addendum. Not so.

**¶28**        As the express language of the 2010 Agreement and the Sixth Addendum show, however, TRL's "option" is not an option to purchase property but rather an option to convert phases. In the 2010 Agreement, Section 1.2 references "TRL's option to purchase the Trust Property (through exercise of its option to convert all Un-Converted Phases to

Converted Phases)." Section 1.3, in discussing TRL's election not to proceed, states that the 2010 Agreement "provides TRL with an option [but] not an obligation to convert Un-Converted Phases to Converted Phases." Section 4.3 of the 2010 Agreement, by contrast, specified TRL's purchase obligations until modified by the Sixth Addendum.

**¶29**        Contrary to TRL's argument, its option to convert phases has been distinct from its purchase obligation for more than a dozen years. The 2010 Agreement separates Section 1.3, TRL's option to not proceed with establishing more Converted phases, from Section 4.3, the minimum number of lots that TRL is obligated to purchase. TRL is correct that the Sixth Addendum does not delete or terminate the 2010 Agreement's "longstanding [o]ption structure" and the provisions "confirming the 'option' relationship survived the Sixth Addendum." While the Sixth Addendum removes the requirement that TRL use the Junior Trust Mechanism (i.e., Convert Un-converted Phases in the Master Trust to Converted Phases in the Junior Trust), it allows TRL the option to convert phases if it chooses to do so. Section 5 of the Sixth Addendum states "TRL may, but shall not be required to, utilize the Junior Trust conversion mechanism to acquire Un-Ripe Converted Phases or Un-Converted Phases." That continuing option structure, however, does not modify TRL's purchase obligations under the 2010 Agreement as modified by the Sixth Addendum.

**¶30**        As the superior court concluded, the Sixth Addendum: (1) maintained TRL's "option" to convert phases as reflected in the 2010 Agreement; (2) expressly updated Section 4.3 of the 2010 Agreement; and (3) added the concept of "Density Units," which imposed a broader purchase obligation. For all these reasons, the superior court correctly granted summary judgment in favor of ICR.

## IV.    The Superior Court Did Not Rely on Parol Evidence.

**¶31**        TRL asserts that the superior court improperly "looked to extrinsic or parol evidence" when granting summary judgment for ICR. TRL contends that the parol evidence the superior court relied on was ICR's draft Term Sheet that the parties exchanged while negotiating the Sixth Addendum. TRL argues that, in doing so, the court failed to consider all parol evidence, which it asserts was reversible error.

**¶32**        "'When interpreting an agreement, the court may always consider the surrounding circumstances' and 'the context in which it was made.'" *Miller v. Hehlen*, 209 Ariz. 462, 466 ¶ 12 (App. 2005). However,

"[w]hen two parties have made a contract and have expressed it in writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 Arthur L. Corbin, CORBIN ON CONTRACTS § 573 at 357 (1960). As reflected in the 2010 Agreement, the parties' written contracts were integrated agreements, representing "the entire agreement between the parties." That provision, along with the express terms, suggests there would be no occasion to consider parol evidence in interpreting the terms of the parties' contractual agreements. Contrary to TRL's argument, however, the superior court did not rely on the Term Sheet as parol evidence.

¶33 The minute entry granting ICR summary judgment mentioned the Term Sheet in addressing TRL's claim that it was unaware of the required payment obligation. In doing so, the court noted TRL's argument that Section 7 of the Sixth Addendum "imposed a new [payment] obligation on TRL" as discussed above. The court noted that the Term Sheet, in which TRL proposed a change to its payment obligations that ICR did not accept, "supports ICR's position that TRL was aware of the required payment obligation." The court made no more mention of the Term Sheet, and there is no suggestion that it relied on its provisions in interpreting the contractual terms. In recognizing that a party was seeking to take a position during litigation that was contrary to its position before the dispute arose, the superior court did not use the Term Sheet as parol evidence to interpret the contract. *Cf. Terry v. United Parcel Service, Inc.*, 253 Ariz. 55, 50 ¶ 24 (App. 2022) (in different context, noting the doctrine of judicial estoppel prevents a party from taking different factual positions at different times).

¶34 TRL also argues the court relied on parol evidence because, in denying ICR's motion for judgment on the pleadings early in the case, it determined "that Section 7 of the Sixth Addendum was reasonably susceptible to more than one interpretation." In denying that motion, the court observed that TRL's "interpretation is plausible." Where a court finds contract language reasonably susceptible to different interpretations, parol evidence may be admissible. *See, e.g., Taylor*, 175 Ariz. at 152-55; *Town of Marana v. Pima Cnty.*, 230 Ariz. 142, 147 (App. 2012). But TRL cites no authority for the proposition that an observation in denying a motion for judgment on the pleadings is binding when, after discovery, a court finds no disputed issues of material fact and that one party is entitled to summary judgment. Under TRL's position, denial of a Rule 12(c) motion would preclude entry of summary judgment under Rule 56. TRL cites no authority for that novel proposition, and the court is aware of none.

¶35        Because the record does not show that the superior court relied on parol evidence in granting summary judgment for ICR, TRL's arguments to the contrary fail.

**V.        Other Issues TRL Seeks to Raise Do Not Show the Superior Court Erred.**

¶36        TRL argues the superior court: (1) improperly rendered material contract provisions ineffective; (2) "created or require[d] the creation of" new contract provisions; (3) erred by concluding there was mutual assent between TRL and ICR for the Sixth Addendum and (4) failed to recognize the Sixth Addendum was not supported by adequate consideration. The court addresses each issue in turn.

**A.        The Superior Court's Ruling Did Not Render Material Contract Provisions Ineffective.**

¶37        "A contract should be construed to give effect to all its provisions." *Scholten v. Blackhawk Partners*, 184 Ariz. 326, 329 (App. 1995). TRL argues the superior court erred because the court's interpretation of the 2010 Agreement (ruling that Section 1.3 was still in effect) and the Sixth Addendum (ruling that Section 7 imposed a purchase obligation) renders various provisions of the Sixth Addendum, the 2010 Agreement and the 2010 Master Trust Agreement meaningless. In doing so, TRL's brief bullet points twenty contract provisions without any substantive discussion or explanation. This failure to develop the argument, with any supporting authority, constitutes waiver. *See MacMillan v. Schwartz*, 226 Ariz. 584, 591 ¶ 33 (App. 2011) ("Opening briefs must present significant arguments, supported by authority, setting forth the appellant's position on the issues raised;" a failure to do so "constitutes abandonment and a waiver") (citations omitted); *Schabel v. Deer Valley Unified Sch. Dist. No. 97,* 186 Ariz. 161, 167 (App. 1996) (issues not clearly raised and argued in a party's appellate brief are waived).

¶38        Waiver aside, the superior court's ruling did not render any contract provisions meaningless. The grant of summary judgment declared the meaning of the parties' contracts. As for the 2010 Agreement and the 2010 Master Trust Agreement, the Sixth Addendum either (1) did not change the prior provisions; (2) supplemented or augmented the prior provisions without changing them or (3) changed the prior provisions. The first two options could not make the 2010 Agreement ineffective or meaningless; the third option is squarely addressed in the Sixth

Addendum, in which the parties agreed that its terms "shall control" to the extent it conflicts with the prior agreements.

**¶39**        The Sixth Addendum's provisions also did not lose meaning. By way of example, TRL points to Section 8(d), which states "[a]t the end of the Extended Option Term or upon a TRL Default Event, any unused available density in the Project (for which TRL has not paid Base Lot Release Payments) will revert to the exclusive use of ICR within the Development Agreement Property." Section 8(d), however, is not inconsistent with Section 1.3 of the 2010 Agreement and Section 7 of the Sixth Addendum. Under Section 8(d), density will only be returned to ICR when TRL commits a Default Event. As outlined in Section 12.3 of the 2010 Agreement, a Default Event occurs when TRL abandons the project (i.e., fails to market the lots or provide financial support to the Talking Rock club facilities), breaches its obligations under Article 5, files a petition in a bankruptcy, reorganization, winding up or liquidation proceeding, or defaults under any project financing. Section 1.3 of the 2010 Agreement, however, concerns elections to no longer acquire property, not any specified Default Events. Thus, the superior court's ruling that Section 1.3 was still in effect and that Section 7 imposed a purchase obligation on TRL had no effect on the utility of Section 8(d).

**¶40**        TRL has failed to show that the superior court's rulings improperly rendered material contract provisions ineffective or meaningless.

### B.        The Superior Court Did Not Create or Require the Creation of New Contract Provisions.

**¶41**        TRL asserts that "[n]either the 2010 Option Agreement nor the Sixth Addendum contain or include any structure or mechanism that contemplates or supports an ongoing obligation to purchase Lots from the Master Trust (or directly from ICR) following a TRL Default Event or an Article 3 Termination." TRL's assertion, however, is not supported by the record or the text of the 2010 Agreement read in conjunction with the Sixth Addendum, as discussed above.

**¶42**        The superior court's conclusions about the Sixth Addendum's purchase obligations and Sections 1.2 and 1.3 of the 2010 Agreement did not create new contract provisions that the parties had not agreed to previously. On appeal, TRL rhetorically asks if "'TRL's obligations remained after an election by TRL not to proceed or an Article 3 Termination', by what mechanism is this purported purchase 'obligation'

13

conducted or enforced?" The answer is Section 1.3 of the 2010 Agreement, which states:

> Any such election by TRL not to proceed or any such Article 3 Termination (i) shall have no effect on, and shall not relieve TRL, the Guarantors, or the Accommodation Parties of their obligations under this Agreement, the Corporate Guaranty, or any Junior Trust Agreements, all of which shall remain in full force and effect.

The Sixth Addendum states, in Section 1.3 as well as Sections 12.2.(a) and 12.4(a), that TRL's termination or election not to proceed with acquiring more property does not affect its other obligations. As discussed above, the Sixth Addendum added a new obligation under Section 7, not previously included in the 2010 Agreement, requiring TRL to purchase all Density Units before the end of 2027. And because the Sixth Addendum's terms are controlling, the "obligations" that Sections 1.3, 12.2(a), and 12.4(a) encompass include this new obligation to purchase Density Units. Thus, given the plain contractual language, TRL has failed to show the superior court's rulings created or required the creation of new contract provisions.

### C.    The Superior Court Properly Rejected TRL's Argument That There Was No Mutual Assent Between TRL and ICR.

¶43        "[B]efore there can be a binding contract there must be mutual consent of the parties to the terms hereof. There must be a distinct intention common to both and without doubt or difference and until all understand alike there can be no assent." *Gifford v. Makaus*, 112 Ariz. 232, 236 (1975). "[W]hat is operative is the objective manifestations of assent by the parties." *Hill-Shafer P'ship v. Chilson Fam. Tr.*, 165 Ariz. 469, 474 (1990) (citation omitted). A misunderstanding must be reasonable before a court may properly find a lack of mutual assent. *Id.* at 475. "Relief is proper if the writing evidencing the purported agreement is uncertain or ambiguous." *Id.* at 474.

¶44        Here, the superior court noted mutual assent between TRL and ICR based on "the plain language of the 2010 Option Agreement and the Sixth Addendum." On appeal, TRL argues that both TRL and ICR have declared that "they would not have entered into the Sixth Addendum had they known how the other party would interpret that document." Mutual assent, however, is based on objective evidence, not the hidden intent of the

parties. *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 384 ¶ 11 (2006) (citation omitted).

**¶45** TRL agreed during a deposition that Section 7, specifically the sentence that states "Base Lot Release payments must be paid for all planned and/or platted Density Units within the Development Agreement Property . . . prior to the end of 2027," was "objective." TRL also agreed during deposition that (1) the definition of "Base Lot Release payments" was not altered by the Sixth Addendum and was defined in the 2010 Agreement, (2) "all planned and/or platted Density units" "catches all" remaining property within the project and (3) "prior to the end of 2027" is an objective time period.

**¶46** Based on the record, TRL has shown no error in the superior court rejecting its lack of mutual understanding argument.

### D. The Superior Court Properly Rejected TRL's Argument That It Did Not Receive Adequate Consideration.

**¶47** To be enforceable, a contract must be supported by consideration. *See Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 165 Ariz. 25, 29 (App. 1990). Mutual promises are sufficient consideration; they need not be of equal value, and a court does not inquire into their adequacy on appeal. *Nickerson v. Green Valley Recreation, Inc.*, 228 Ariz. 309, 321 ¶ 29 (App. 2011). "A written contract imports a consideration. The burden of showing a lack or failure of consideration is upon the party attacking it." *Dunlap v. Fort Mohave Farms, Inc.* 89 Ariz. 387, 393 (1961) (citations omitted).

**¶48** In claiming there was inadequate consideration for the Sixth Addendum, TRL argues that: (1) "[the] updated Junior Trust provisions primarily benefited ICR," (2) by creating changes to the Junior Trust provisions, ICR gained a $4,500,000 incremental benefit and (3) the Sixth Addendum's revisions "did not constitute appropriate or separate 'consideration' for imposing an incremental $10,000,000 purchase 'obligation' on TRL." TRL then concedes, however, that "[t]he Sixth Addendum's Junior Trust revisions benefited both parties."

**¶49** TRL cites no authority showing that consideration between parties must be equal. Consideration is "a benefit to the promisor or a loss or detriment to the promisee." *Fed. Rubber Co. v. Pruett*, 55 Ariz. 76, 79 (1940). Along with TRL's concession that both parties received benefits, under the Sixth Addendum, TRL received (1) an extension of the option to convert phases from 2019 to 2027 (§ 6); (2) the ability to satisfy its Annual

Performance Covenant by purchasing Un-Converted Phases (§ 3); and (3) the ability to substitute guarantors (§ 7). On this record, TRL has failed to show the superior court erred in concluding that adequate consideration supported the Sixth Addendum.

## VI. Attorneys' Fees.

**¶50** TRL and ICR each request their attorneys' fees on appeal, citing the 2010 Agreement, A.R.S. § 12-341.01, and ARCAP 21. Because TRL is not a successful party, its request is denied. ICR, however, is the successful party in this "contested action arising out of a contract." A.R.S. § 12-341.01(A). ICR is therefore awarded its reasonable attorneys' fees incurred on appeal, as well as its taxable costs on appeal, contingent upon its compliance with ARCAP 21.

## CONCLUSION

**¶51** The judgement is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA